

# Transcript of Charles Beegle

**Date:** October 27, 2023
**Case:** Iacobeti -v- Weeks

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## Page 1

```
        IN THE UNITED STATES COURT
         FOR THE DISTRICT OF MARYLAND
              NORTHERN DIVISION
-----------------------------  :
ANDREEA IACOBETI,              :
     Plaintiff,                :
                               :
  v.                           : Case No.:
                               : 1:23-CV-1758
GENNA LEIGH ROSE WEEKS,        :
     Defendant.                :
-----------------------------  :

       Mobile Videoconference Deposition of
                 CHARLES BEEGLE
                Conducted Virtually
             Friday, October 27, 2023
                    3:15 p.m.



Job No.: 511219
Pages 1 through 78
Reported by: Peggy L. Dingle
```

## Page 2

Mobile videoconference deposition of CHARLES BEEGLE, conducted virtually:

Pursuant to agreement, before Peggy L. Dingle, E-Notary Public of the State of Maryland.

## Page 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
  WILLIAM C. HUDSON, ESQUIRE
  Law Office of William C. Hudson
  9748 Stephen Decatur Highway
  Suite 111
  Ocean City, Maryland  21842
  (410)390-7745

ON BEHALF OF DEFENDANT:
  DAVID H. FLEISHMAN, ESQUIRE
  Budow and Noble, P.C.
  Twinbrook Metro Plaza
  12300 Twinbrook Parkway
  Suite 540
  Rockville, Maryland  20852
  (301)654-0896

## Page 4

C O N T E N T S

| EXAMINATION OF CHARLES BEEGLE | PAGE |
|---|---|
| By Mr. Fleishman | 5 |
| By Mr. Hudson | 39 |
| By Mr. Fleishman | 69 |
| By Mr. Hudson | 73 |

E X H I B I T S

(Retained by Counsel)

| BEEGLE DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| 1 | Photograph | 17 |
| 2 | Photograph | 22 |

**Page 61**

1 the defendant, the vehicle that struck the young
2 lady, was traveling the speed limit as she
3 entered the intersection, correct?
4 **A   I would say yes.**
5 Q   Okay. And you indicated that as she
6 entered the intersection there were four
7 pedestrians in the crosswalk westbound, correct?
8 **A   I don't know where the other three**
9 **were at the time that your client got hit.**
10 Q   Understood. But -- but prior to that
11 when you first saw the young lady --
12 **A   Okay.**
13 Q   -- you indicated that there were three
14 other pedestrians who were walking several feet
15 behind her westbound, correct?
16 **A   Correct.**
17 Q   And I am just trying to understand
18 your perspective on this. Please forgive me.
19 **A   No problem.**
20 Q   But you have got -- you have got a
21 yellow flashing light which means proceed with
22 caution. You have got four pedestrians in a

**Page 62**

1 clearly designated, painted crosswalk and you
2 have got a driver who drives into an intersection
3 controlled by a yellow flashing light at the
4 posted speed limit. And -- and -- and am I
5 correct that you think there was nothing she
6 could do that would have avoided this accident?
7        MR. FLEISHMAN: Objection to the form.
8        MR. HUDSON: Understood.
9 BY MR. HUDSON:
10 Q   You can answer.
11 **A   Correct. In my -- in my opinion,**
12 **yeah, I don't think there is anything that she**
13 **could have done.**
14 Q   Okay. You indicated that she jammed
15 on her brakes. At what point did you see any
16 evidence that she was applying her brakes prior
17 to the impact?
18 **A   I -- I couldn't tell that she braked**
19 **prior to the impact. I couldn't tell. I**
20 **couldn't see her rear end.**
21 Q   Do you have any reason to believe she
22 braked prior to the impact?

**Page 63**

1 **A   I am not going to speculate. I**
2 **don't -- I don't know, honestly.**
3 Q   Can you make -- can you, as you sit
4 here today, tell me any observations you made
5 that would serve as basis for believing that she
6 applied her brakes at any time prior to the point
7 of impact.
8 **A   As soon as she hit that pedestrian she**
9 **stopped immediately. I didn't hear tires**
10 **screeching or anything. It -- it seemed like it**
11 **was she hit and the car stopped at the same time.**
12 Q   Again, the question was prior to the
13 point of impact did you make any observations --
14 **A   I did not.**
15 Q   -- that serves as the basis -- you did
16 not. Okay. I am almost done, I promise you.
17 **A   I hope everything works out for both**
18 **sides. I know it was a scary, scary situation.**
19 **I am glad she is alive.**
20 Q   She is, too.
21    MR. FLEISHMAN: Everyone is.
22    THE WITNESS: Yeah.

**Page 64**

1 BY MR. HUDSON:
2 Q   Now, you indicated that when you spoke
3 with the officer he asked you some questions and
4 then he wrote things down.
5 **A   Yes.**
6 Q   And there is -- there is a written
7 statement that was produced by the Ocean City
8 Police Department, and I -- I see where you
9 signed it. The handwriting, though, that -- that
10 describes what you saw did you write that or did
11 he?
12 **A   That was me. So he wrote in his**
13 **notebook my information, right? And then he went**
14 **back to his car and gave me a paper and it said**
15 **to -- he told me to explain in very good detail**
16 **that I can remember what happened. So everything**
17 **was in my -- my writing.**
18 Q   Okay.
19 **A   I hope you can read it because I don't**
20 **write the best.**
21 Q   No, it's -- it's -- compared to mine
22 it's wonderful.

### Page 69

1 to --
2     MR. FLEISHMAN: Yeah, so I have to see
3 what happened. It might be helpful to me. I
4 know we have the police report and the narrative
5 but I didn't see --
6     MR. HUDSON: Bear with me one second,
7 David.
8     MR. FLEISHMAN: Sure. We can go off
9 the record for a minute.
10     (Thereupon, a break was taken, and the
11 deposition continued as follows:)
12     EXAMINATION BY COUNSEL FOR DEFENDANT
13 BY MR. FLEISHMAN:
14   Q  All right. I will agree that your
15 handwriting is better than mine as well.
16     All right. Just a few very brief
17 follow-ups. The -- I know that Mr. Hudson had
18 asked you about the lane in which my client's
19 vehicle was in at the time of the impact, right?
20   A  Okay.
21   Q  And you had said lane four, which is
22 that lane directly next to that left turning

### Page 70

1 lane?
2   A  Correct.
3   Q  All right. And -- and I just want to
4 confirm that when I was questioning you the first
5 time that you saw her vehicle was when you had
6 said the front of her vehicle would have been
7 towards the back of that white car?
8   A  That is correct.
9   Q  Okay. And so you saw her vehicle only
10 very shortly before the impact?
11   A  Correct.
12   Q  Just a few seconds you said?
13   A  Correct.
14   Q  All right. And so if she was
15 traveling in a different lane before that and had
16 moved over to that lane immediately before, you
17 wouldn't know that?
18   A  That is correct. I wouldn't have
19 noticed.
20   Q  And you indicated that her -- that my
21 client's vehicle came to a stop at the moment of
22 the impact?

### Page 71

1   A  Yes.
2   Q  And you didn't hear any tires
3 screeching?
4   A  Not that I recall, no.
5   Q  Okay. And you didn't see any, like,
6 tire marks or skidmarks?
7   A  To be honest with you, I didn't look
8 for tire marks or skidmarks, no.
9   Q  All right. Would you -- based on how
10 you described it with the car stopping within
11 seconds of hitting her, would you agree that the
12 car had to be slowing down before the impact?
13   A  For it to stop as soon as it hit the
14 pedestrian, yeah, I would say yes.
15   Q  Okay. And that's what you are saying
16 happened?
17   A  Yes.
18   Q  And as far as going the speed limit,
19 that's what you are estimating? She could have
20 been going less than the speed limit, could have
21 been going the speed limit? You are not...
22   A  See, Mr. -- Mr. Hudson asked me if I

### Page 72

1 noticed that she was slowing down. And I did
2 not -- I -- I can't tell if she was slowing down
3 or not. That's why I think she was going the
4 speed limit because as soon as she hit that lady
5 she stopped instantly.
6     Now, I am not sure what the speed
7 limit is. So she couldn't have been going that
8 fast is why I am saying that because as soon as
9 she hit that lady she come to an instant stop.
10   Q  Okay. That's fair. We keep saying
11 the speed limit but I guess no one has actually
12 asked the question of what -- what do you believe
13 the speed limit was?
14   A  Yeah, I -- I think it's 35 or 45 but I
15 could be wrong. I don't know.
16   Q  Okay. And would you agree with me if
17 she was going 35 at the time of the impact the
18 car wouldn't have just been able to stop?
19   A  Right. Correct.
20   Q  All right. So she had -- you would --
21 it would make sense that she was probably going
22 less than that at the time?

**Page 73**

1  A  Yes.
2  Q  And --
3     MR. FLEISHMAN: Well, actually, I think that's all that I got.
5     Bill?
6     MR. HUDSON: I have one further line of questioning, if you -- if you will indulge me.
8     EXAMINATION BY COUNSEL FOR PLAINTIFF
9  BY MR. HUDSON:
10 Q  Did -- did you happen to see where her phone went as a result of the impact?
12 A  I did not. I remember her phone sliding across the blacktop towards the middle. I don't know how far away from her it was but I do you remember her phone flying and sliding across the road.
17 Q  Do you recall anything about what happened to her earbuds as a result?
19 A  I -- I do not.
20 Q  Do you recall whether she was carrying anything other than her cell phone?
22 A  I don't remember.

**Page 74**

1  Q  Other than that she was wearing a holiday -- Quality Inn shirt or a badge or something, do you remember anything about her attire?
5  A  She had -- I do not. I just remember the badge saying Quality Inn and her name.
7  Q  But you don't remember whether she was wearing shorts or long pants?
9  A  I do not.
10 Q  Don't recall the color of her pants?
11 A  I do not.
12 Q  Don't recall what kind or color of shirt she was wearing?
14 A  I think it was black but I am not a hundred percent sure.
16 Q  Do you recall what kind of footwear she was wearing?
18 A  No, I don't remember that, either.
19 Q  Do you remember whether she had long or short hair?
21 A  I think it was shoulder length. Is that long? It's longer than yours. Longer than

**Page 75**

1  mine.
2  Q  Do you recall whether she was wearing eyeglasses or sunglasses?
4  A  I don't remember. I don't think she was wearing either but I -- I honestly don't remember.
7  Q  Do you recall whether she spoke with an accent?
9  A  I think she had a little accent. I am from Pennsylvania. So everybody further south of me has a little accent.
12    MR. HUDSON: Okay. I -- I have no further questions. Thanks again.
14    MR. FLEISHMAN: All right, Mr. Beegle, that's it. So we appreciate your time.
16    I have just got to let you know that you have the -- you have the right to read your deposition transcript and the court reporter can send it to you. You can read it. You can confirm everything in there is accurate and then you can sign or you can waive that right and under the assumption that the court reporter was

**Page 76**

1  able to understand and hear everything that you said and accurately recorded your testimony.
3     I can't advise you but it's totally up to you what you want to do. Ordinarily people --
5     THE WITNESS: I will waive.
6     MR. FLEISHMAN: Okay. Ordinarily people do if there is no issues hearing but let's just ask the court reporter first, make sure.
9     COURT REPORTER: Everything sounded fine.
11    MR. FLEISHMAN: Okay. All right, Mr. Beegle.
13    THE WITNESS: I will waive everything. That's all I can remember. I am totally honest so...
16    MR. FLEISHMAN: We appreciate your -- we appreciate your time.
18    THE WITNESS: Thank you, guys. I appreciate it.
20    COURT REPORTER: And, Mr. Hudson, are you ordering a copy of the transcript?
22    MR. HUDSON: I am going to wait until