IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREA IACOBETI,

    *Plaintiff,*

    v.

                     Civil Action No.
                     23-CV-1758-ABA

GENNA LEIGH ROSE WEEKS,

    *Defendant*

**MEMORANDUM OPINION**

An out-of-order traffic light, whether entirely non-functional or flashing red or yellow lights, is what some might call an accident waiting to happen. Unfortunately, on a summer day in 2022, such an accident did happen. Pedestrians were crossing Philadelphia Avenue, a busy road in Ocean City, Maryland. Two of them, Plaintiff Andreea Iocabeti and non-party Elif Yilderal, were heading west in the crosswalk when a car traveling southbound did not stop at the light and struck them both. Ms. Yilderal, who was on a bike, did not sustain any serious injuries. But the impact to Ms. Iocabeti, who was on foot, rendered her unconscious. She has sued the driver of the car, Gemma Leigh Rose Weeks, for negligence and gross negligence.

Ms. Weeks denies being negligent or grossly negligent, and has moved for summary judgment. She alternatively contends that Ms. Iocabeti was contributorily negligent. As explained herein, there is no evidence from which a reasonable jury could find that Ms. Weeks was grossly negligent. She is therefore entitled to summary judgment as to that claim. But as explained below, a reasonable jury could conclude that she is liable for negligence, and further that Ms. Iocabeti was not contributorily negligence. Because there is admissible evidence from which a reasonable jury could conclude that the accident was the result of Ms. Weeks' negligence

alone, the motion for summary judgment as to Ms. Iocabeti's negligence claim, and corresponding motion to strike, will be denied.

## BACKGROUND[1]

A number of the material facts surrounding the accident are not in dispute. Ocean City, Maryland is located on a narrow peninsula, oriented roughly north-south. The accident occurred at the intersection of 17th Street and Philadelphia Avenue, the main north-south road in the area. At this intersection, Philadelphia Avenue has four northbound lanes and five southbound lanes. The southbound part of the road consists of a right lane, designated for buses and right-turning traffic only, three main (straight going) lanes, and a left-turn lane. There are marked crosswalks on all four sides of the intersection. The layout is reflected in Exhibit A to Ms. Weeks' motion, included below. (Ms. Weeks added the compass directions for reference):



---

[1] Because Ms. Weeks has moved for summary judgment, the Court must view the evidence in the light most favorable to Ms. Iocabeti, as the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in her favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The facts are set forth with this standard in mind.

The traffic lights at this intersection were not operating correctly that day. The lights controlling northbound and southbound traffic were flashing yellow. Def.'s Mem. Ex. C, ECF No. 21-6 ("Weeks Dep.") at 17-18. The lights controlling eastbound and westbound travel on 17th Street were flashing red. *Id.* The pedestrian signals controlling the crosswalks were not functioning at all. *Id.* at 54-55.

The collision happened in the northern crosswalk of the intersection. As noted above, Ms. Iocabeti was walking west across Philadelphia Avenue. Ms. Yilderal was also in the northern crosswalk at the time, biking in the same direction. They crossed the four northbound lanes, the concrete median, and two southbound lanes. They were crossing the middle "through" lane of southbound traffic when Ms. Weeks, who was driving south in that lane, hit them both with her car. The passenger-side front bumper of the car contacted the rear tire of Ms. Yilderal's bike. Ms. Iocabeti was hit by the driver-side front bumper.

Most of the remaining material facts are in dispute. There are seven principal sources of evidence about the moments and circumstances leading up to the collision.

First, there is the testimony of Ms. Iocabeti, who denies having any recollection of the accident. Def.'s Mem. Ex. E, ECF No. 21-8 ("Iacobeti Dep.") at 17:19-20. She remembers having informed her manager at work of her intent to run an errand during her lunch break. Her next memory is "wak[ing] up in the ambulance." *Id.* at 17:21-18:5; *see also id.* at 44:1-2 ("I don't remember the accident and everything before and after the accident."). When asked whether she was looking down at her phone when the accident happened (as one of the other witnesses contends, as discussed below), Ms. Iocabeti responded, "I can't say anything because I don't remember." *Id.* at 38:2-9. Later, however, she testified that when she crosses streets in general, she "stop[s] in a safe place to be sure that [she] can cross or not," and when she "can

cross, [she] will cross the street right when it is safe for [her] to cross the street." *Id.* at 42:21-43:2.

The second source of evidence is Ms. Weeks' testimony. In her version of events, she left her job on 24th Street and drove south on Philadelphia. Weeks Dep. at 18:18-20. As she approached the intersection with 17th Street, she noticed that the lights controlling traffic on Philadelphia were flashing yellow, and that the lights controlling traffic on 17th were flashing red. *Id.* at 17:21-18:4. She slowed down as she approached the intersection, but because the lights in her direction were flashing yellow, she concluded she could "keep going." *Id.* at 18:5. She saw a car, possibly an SUV, in the left-turn lane (*i.e.*, two lanes to her left) stopped at the intersection, waiting to turn left. *Id.* at 19:16-20:13. She does not recall how fast she was driving at the time of impact, and she does not recall having seen Ms. Iocabeti before then. *Id.* at 45:14-15, 54:1-6. After the collision, she stepped out of her car, heard people "yell that she [Ms. Iocabeti] wasn't breathing," and saw that Ms. Iocabeti was bleeding from her head. *Id.* at 53:2-18.

Third, there is the recollection of Ms. Yilderal, who did not know Ms. Iocabeti before the collision but was just feet ahead of her when it happened. ECF No. 28-1 ("Yilderal Dec.") ¶ 18.[2] According to Ms. Yilderal's declaration, she observed Ms. Iocabeti "talking with someone on her cell phone" before entering the crosswalk. *Id*. ¶ 15. But Ms. Yilderal believes that "[Ms. Iocabeti] was not still on the phone while [they] crossed." *Id*. Ms. Iocabeti was initially in front of Ms. Yilderal as they started across Philadelphia and, according to Ms. Yilderal, appeared "to be

---

[2] The statement from Ms. Yilderal is titled "Affidavit." Because it is not notarized, the Court treats it as a declaration—though both affidavits and declarations are appropriate forms of evidence for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(A).

attentive to where she was going and to walk in the crosswalk at a straight and steady pace in an effort to safely complete the crossing." *Id.* ¶¶ 6, 16. As the two of them approached the median, "the vehicles in the southbound left turn lane and southbound Lane 3 (the lane immediately adjacent to the left-turn lane) also stopped to permit [Ms. Yilderal and Ms. Iocabeti] to complete [their] crossing." *Id.* ¶ 7.[3] As they crossed "in front of the vehicle stopped in Lane 3," Ms. Yilderal began to overtake Ms. Iocabeti. *Id.* ¶ 8. Ms. Yilderal maintains that she tried to "keep a lookout for approaching vehicles but did not see any and, as such, thought it was safe to complete the crossing." *Id.* ¶ 9. As she was "crossing Lane 2 (the middle 'thru' [sic] lane) of southbound Philadelphia Avenue, a vehicle [Ms. Weeks' car] drove past the two stopped vehicles and directly into the marked crosswalk, striking the rear wheel of [Ms. Yilderal's] bicycle with the passenger-side front bumper and [Ms. Iocabeti] with the driver-side front bumper." *Id.* ¶ 10. Ms. Yilderal "fell, but fortunately was not injured." *Id.* ¶ 11. Ms. Iocabeti, however, "was knocked unconscious and appeared to suffer serious injuries." *Id.* ¶ 12.

Ms. Yilderal states that she "would have expected that as the driver of the vehicle in Lane 2 of southbound Philadelphia Avenue approached the intersection, [Ms. Weeks] could have easily observed [Ms. Yilderal and Ms. Iocabeti] crossing in the marked crosswalk and the two vehicles stopped ahead of her [Ms. Weeks] to permit us to complete our crossing." *Id.* ¶ 14.

The fourth source of evidence comes from Charles Beegle, another pedestrian who was crossing Philadelphia Avenue when the collision happened. He claims to have seen the events from the southern crosswalk of the intersection, which parallels the northern crosswalk. He

---

[3] There appears to be a dispute whether there was a car stopped in the lane to Ms. Weeks' left in the moments before the collision; while Ms. Yilderal says there was, Yilderal Dec. ¶ 8, Ms. Weeks' recollection seems to be that the car in the lane to her left "behind" her, Weeks Dep. at 19:18-19.

entered the southern crosswalk with his son, and they headed west just as Ms. Iocabeti and Ms.

Yilderal started to cross to the intersection in the northern crosswalk. That is, both pairs of

pedestrians began crossing Philadelphia Avenue in the same direction at the same time. Mr.

Beegle and his son stopped at the median on the south side of the intersection to look northward,

across the intersection, for oncoming traffic. Def.'s Mem. Ex. D, ECF No. 21-7 ("Beegle Dep.")

at 19:6-9. Mr. Beegle described the incident at issue as follows:

> When[] we stopped in the middle we noticed that the younger lady
> was above us at the next set of lines up and she was crossing and she
> was looking down at her phone and she had her earbuds in and she
> was not paying attention. And whenever she made it to the center,
> she walked out. There was a car stopped in the turning lane on
> Philadelphia Ave going south. She walked in front of it and
> whenever she crossed over in front of that parked car that's when
> she got hit. And my son and I saw -- saw her get hit.

*Id.* at 19:9-20; *see also id.* at 25:18-26:2 ("[A]ll the lights were flashing because they weren't -

they were not working. And I kept watching her and looking at traffic. And there was a car in that

turning lane beside that white car on the other side. It was stopped and she continued to walk

straight without stopping, looking or anything."). In his deposition, Mr. Beegle recalled that the

collision occurred in the lane designated for straight-proceeding southbound traffic immediately

next to the left-turn-only lane. *Id.* at 27:2. He initially testified that Ms. Weeks was "going the

speed limit" when she hit the pedestrians but later said that he could not judge her speed. *Id.* at

28:5-6, 11-12.

    Fifth, a video captured the incident, albeit from a distance. The record includes an extract

from a north-facing surveillance camera located two blocks south of the intersection. Def.'s

Mem. Ex. F. The video is grainy and thus difficult to discern. But viewed in the light most

favorable to Ms. Iocabeti, as it must be in the context of a motion for summary judgment filed by

Ms. Weeks, it shows a car forcefully hitting a pedestrian crossing Philadelphia Avenue, propelling the pedestrian some distance through the air and onto the street.

Sixth, there is a police report that was filed after the incident. Def.'s Mem. Ex. B, ECF No. 21-5. Its narrative section contains a description of the accident, including Mr. Beegle's report to the police that Ms. Iocabeti "was actively looking down at her phone as she crossed." *Id.* at 1; *see also* Beegle Dep. at 32:18 ("[T]here was a police officer standing there and I told him, I saw the whole thing. And he asked me for what I saw and he wrote everything down.").

The last principal source of evidence are the affidavits of three additional eyewitnesses to the incident. Leo Gueriguian, who was driving on Philadelphia Avenue when the accident happened, is the first witness. Pl.'s Opp. Ex. E, ECF No. 30-3 ("Gueriguian Dec."). The other two are the driver of the car behind him, Kevin Wertlieb, and Mr. Wertlieb's passenger, Jacob Ginsberg. Pl.'s Opp. Ex. C, ECF No. 30-1 ("Ginsberg Dec."); Pl.'s Opp. Ex. D, ECF No. 30-2 ("Wertlieb Dec."). These three witnesses contend, in summary, that they were traveling in the left-most straight-going southbound lane; as they approached the intersection with 17th and saw the flashing yellow lights, they "came to a complete stop"; a pedestrian (Ms. Iocabeti) and cyclist (Ms. Yilderal) crossed in front of Mr. Gueriguian's car; an SUV in the lane to their right (Ms. Weeks' vehicle) arrived at the intersection, and "did not appear to slow down"; the cyclist sped up to cross after noticing that the SUV was "not slowing down"; and the SUV struck the rear wheel of the cyclist's bicycle as well as the pedestrian, who was "thrown a good distance into the intersection where she landed on the asphalt, appearing not to move." Gueriguian Dec. ¶¶ 2, 6-8, 13-18; Ginsberg Dec. ¶¶ 2, 6-8, 13-18; Wertlieb Dec. ¶¶ 2, 6-8, 13-18. They also contend that neither the pedestrian nor cyclist "darted out into traffic" or "did anything [the witnesses] would consider to be sudden, erratic or unpredictable." Gueriguian Dec. ¶ 20; Ginsberg Dec. ¶ 20;

Wertlieb Dec. ¶ 20. None of those witnesses state whether Ms. Iocabeti was looking down at her phone at the time, as Mr. Beegle, who was watching from across the street, contends.

## PROCEDURAL HISTORY

Ms. Iocabeti filed her complaint in this case in July 2023 asserting two claims: for negligence (Count 1) and gross negligence (Count 2). Discovery closed in December 2023. *See* ECF No. 14-1 (proposed scheduling order); ECF No. 17 (approving joint status report approving proposed schedule). In January 2024, Ms. Weeks filed the instant motion for summary judgment, ECF No. 21, and its accompanying memorandum, ECF No. 21-2 ("Def.'s Mem."), and exhibits, ECF No. 21-4 to -9, which Ms. Iocabeti opposed. ECF No. 24. As discussed below, Ms. Weeks moved to strike one of Ms. Iocabeti's exhibits, ECF No. 26, and filed a reply brief in support of summary judgment, ECF No. 25. Ms. Iocabeti thereafter filed an opposition to the motion to strike, ECF No. 28, and, after the briefing on Ms. Weeks' motions was complete, a supplemental response in opposition to summary judgment, ECF No. 30, with declarations from the additional witnesses, Mr. Gueriguian, Mr. Wertlieb, and Mr. Ginsberg. ECF Nos. 30-1, -2, -3.

## DISCUSSION

Ms. Weeks has moved for summary judgment, contending there is no genuine dispute of material fact that she was not negligent or grossly negligent. She alternatively contends that even if she was negligent, Ms. Iocabeti was contributorily negligent as a matter of law. Because part of Ms. Iocabeti's evidence submitted to oppose summary judgment includes the declaration from Ms. Yilderal, Ms. Weeks has also moved to strike that declaration. The Court concludes that although Ms. Weeks is entitled to summary judgment on Ms. Iocabeti's gross negligence claim, the motion as to Ms. Iocabeti's negligence claim and Ms. Weeks' contributory negligence defense must be denied.

A.      **The Motion to Strike**

In response to Ms. Weeks' motion for summary judgment, Ms. Iocabeti filed one version of the Yilderal declaration (ECF No. 24-1). Ms. Weeks objected to that declaration because (1) it was not dated, and (2) its affirmation included the italicized caveat: "I solemnly affirm under penalties of perjury and upon personal knowledge that the contents of this document are true *to the best of my knowledge, information and belief*" (emphasis added). *See* Def.'s Mot. to Strike, ECF No. 26 ("Mot. to Strike"), at 7-8. Ms. Iocabeti has subsequently filed an amended declaration, ECF No. 28-1, that addresses both issues. The amended affidavit is dated (February 21, 2024). And it omits the complained-of caveat, replacing the above affirmation language with the following: "I declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge." Yilderal Dec. ¶ 19. Accordingly, the alleged defects to the Yilderal Declaration have been cured, and are thus moot.

Ms. Weeks' motion further contends that the declaration is "riddled with personal beliefs and conclusory statements of M[s]. Yilderal[,] making it difficult to discern which statements contained in the Affidavit are actually based on [her] personal knowledge." Mot. to Strike at 6 ¶ 6. The declaration, as amended, now makes clear that all the statements in the declaration are "based on [Ms. Yilderal's] personal knowledge." Yilderal Dec. ¶ 19. On cross-examination, Ms. Weeks may succeed in disproving or discrediting one or more of Ms. Yilderal's statements. But because the declaration, as amended, satisfies 28 U.S.C. § 1746(2), and because at this stage the statements therein must be accepted as true and any inferences drawn in Ms. Iocabeti's favor, the motion to strike will be denied.

**B.      The Motion for Summary Judgment**

This brings the Court to Ms. Weeks' motion for summary judgment. As noted, she submits two alternative grounds for summary judgment. Her first is that there is no admissible evidence from which a reasonable jury could find that she was negligent. Alternatively, she argues that the undisputed facts establish Ms. Iocabeti's contributory negligence, barring her recovery. The record contains evidence from which a reasonable jury could conclude that Ms. Weeks was negligent. The record, however, would not support a jury verdict for gross negligence.

**1.      Legal Standard**

Summary judgment is governed by Federal Rule of Civil Procedure 56(a). A party seeking entry of summary judgment must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). As noted above, the Court must consider the facts and all reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott*, 550 U.S. at 378. Generally, "when there is a close question and 'reasonable minds could differ' when weighing the facts against the law, then summary judgment is inappropriate." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989)). But "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477

U.S. 317, 324 (1986). Thus, summary judgment motions should also "be interpreted in a way that allows [the rule] to accomplish this purpose." *Id*.

    **2.**    **Negligence (Count I)**

Ms. Iocabeti's claims are governed by Maryland law. Count I of Ms. Iocabeti's complaint asserts a claim for negligence. A plaintiff seeking to recover for negligence in Maryland must prove "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (citation and emphasis omitted).

Ms. Weeks argues that Ms. Iocabeti has "failed to set forth sufficient evidence to carry the burden of proof necessary" to establish liability for negligence or gross negligence. Def.'s Mem. at 6. She contends that summary judgment is appropriate as to both Counts I and II for three reasons: Ms. Iocabeti's lack of memory of the collision, the lack of evidence to support a verdict against Ms. Weeks, and the lack of evidence to support a breach of duty as provided in a certain section of the Maryland Transportation Code. *Id*. at 8-9. The Court addresses each of these arguments, and in the following section turns to Ms. Weeks' arguments specific to Count II.

Ms. Weeks first points out that Ms. Iocabeti "has no recollection of what occurred in the moments preceding the subject accident, nor the subject accident itself." *Id.* at 8. What that means, according to Ms. Weeks, is that Ms. Iocabeti has only established the "happening of an accident." *Id*. But evidence of Ms. Iocabeti's recollection is not a prerequisite to Ms. Weeks' liability. Ms. Iocabeti has come forward with other evidence regarding the circumstances of the

incident, including eyewitness testimony and video evidence. Ms. Weeks will therefore not be awarded judgment based on Ms. Iocabeti's inability to recall the collision.

Ms. Weeks next argues "there has been no evidence presented in discovery to suggest [she] was speeding or operating her vehicle in a negligent manner." Def.'s Mem. at 8. That may have been the state of the record when Ms. Weeks filed her motion, but the present record includes evidence from which a reasonable jury could conclude that Ms. Weeks was operating her vehicle in a negligent manner. For example, based on the surveillance video of a vehicle colliding with a pedestrian, a reasonable jury could infer that a prudent driver would have stopped at the busy intersection, given that the traffic lights were out of order. A jury could interpret the video differently, or conclude that it is too murky to have any probative value. But because it is Ms. Weeks who is seeking entry of judgment before trial, the Court must consider this evidence in the light most favorable to Ms. Iocabeti.

There is also witness testimony that a reasonable jury could find credible and rely on to return a verdict in favor of Ms. Iocabeti. Ms. Yilderal asserts that she "would have expected" that a driver in Ms. Weeks' lane "could have easily observed us crossing in the marked crosswalk." Yilderal Dec. ¶ 14. And the newly identified eyewitnesses, Mr. Gueriguian, Mr. Ginsberg, and Mr. Wertlieb, who all contend they observed the collision from the adjoining lane, contend that Ms. Weeks "did not appear to slow down" despite circumstances in which they had slowed and stopped at the crosswalk. Gueriguian Dec. ¶ 13; Ginsberg Dec. ¶ 13; Wertlieb Dec. ¶ 13.

Ms. Weeks points to her deposition, in which she testified that she was at all times paying full attention to the roadway and traffic conditions. *See, e.g.*, Weeks Dep. at 57:11-12. She emphasizes the observations of Mr. Beegle, who testified that Ms. Weeks may have been slowing down prior to the collision, and stated "I don't think there is anything that [Ms. Weeks] could

have done" to avoid hitting Ms. Iocabeti. Beegle Dep. at 62:12-13, 63:8-11, 71:9-14. Ms. Weeks contends that her testimony and Mr. Beegle's demonstrate that, as a matter of law, she was not driving in a negligent manner. But there are contrary inferences that could reasonably be drawn from the record as a whole as well.

Ms. Weeks does not refute seeing the traffic signal or deny continuing toward the intersection after noticing that the lights were flashing yellow. Rather, she proceeded based on her own belief that she had exercised adequate caution and could "keep going" without stopping. She also states that she did not see Ms. Iocabeti in the crosswalk before hitting her. A jury could conclude any or all of these statements support a finding that Ms. Weeks was not driving negligently. But the Court must consider the record as a whole, in the light most favorable to the non-moving party, Ms. Iocabeti. The evidence is sufficient from which a reasonable jury could find that Ms. Weeks breached the standard of care.

As her third argument, Ms. Weeks contends that summary judgment should be granted in her favor because Ms. Iocabeti has not produced evidence that Ms. Weeks violated § 21-502 of the Maryland Transportation Code. That statue imposes certain statutory duties on drivers with respect to pedestrians. It requires a driver to "come to a stop when a pedestrian crossing the roadway in a crosswalk is: (i) On the half of the roadway on which the vehicle is traveling; or (ii) Approaching from an adjacent lane on the other half of the roadway." Md. Code Ann., Transp. § 21-502(a). And "[i]f, at a marked crosswalk or at an unmarked crosswalk at an intersection, a vehicle is stopped to let a pedestrian cross the roadway, the driver of any other vehicle approaching from the rear may not overtake and pass the stopped vehicle." *Id.* § 21-502(c). The statute also imposes duties on pedestrians: "A pedestrian may not suddenly leave a curb or other

place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield." *Id.* § 21-502(b).

Ms. Weeks' argument turns on the following language in § 21-502: "This subsection does not apply where . . . [a] traffic control signal is in operation." *Id.* § 21-502(a)(1)(ii). Ms. Weeks argues that although the traffic lights were not "operating as normal," they "were, in fact, operating," and that accordingly Ms. Iocabeti "cannot rely on a violation of Md. Trans. Code § 21-502(a) to establish [Ms. Weeks'] negligence." Def.'s Mem. at 9.

That argument is unavailing for two reasons.

First, insofar as Ms. Iocabeti's claims are premised on violations of statute, § 21-502 is not the only provision of the Maryland Transportation Law that Ms. Iocabeti alleges was violated. Section 21-204(f), for example, provides that where a traffic signal is flashing yellow, although a driver "may proceed through the intersection or past the signal," the driver may only do so "with caution." Md. Code Ann., Transp. § 21-204. Ms. Iocabeti's claims, fairly construed in her favor, allege that Ms. Weeks did not proceed "with caution." Similarly, § 21-504(a) provides, "[n]otwithstanding any other provision of this title, the driver of a vehicle shall exercise due care to avoid colliding with any pedestrian." Md. Code Ann., Transp. § 21-504(a). Ms. Iocabeti contends that, regardless of the applicability of § 21-502, Ms. Weeks did not "exercise due care to avoid colliding" with her. Thus, regardless of whether a traffic light flashing yellow and red lights "is in operation" within the meaning of section 21-502(a)(1)(ii)— which the Court need not and does not decide for purposes of resolving Ms. Weeks' summary

judgment motion—there is evidence from which a reasonable jury could find that Ms. Weeks violated a statutory duty under at least §§ 21-204(f) or -504(a).[4]

Second, regardless of whether there was a violation of statute, Ms. Iocabeti's cause of action is one for negligence. "[V]iolations of a statute are only evidence of negligence in Maryland—they 'do not constitute negligence per se.'" *Carter v. Lindsay Corp.*, No. 21-cv-0311-DKC, 2023 WL 2664211, at *2 (D. Md. Mar. 28, 2023) (quoting *Aravanis v. Rosenberg*, 237 Md. 242, 259-60 (1965)). The central issue remains whether Ms. Weeks "was under a duty to protect the plaintiff from injury" and whether Ms. Weeks "breached that duty." *100 Inv. Ltd. P'ship*, 430 Md. at 212-13, 60 A.3d at 10. Would a prudent driver in Ms. Weeks' position have stopped or slowed down (or slowed down more than she did) before driving into the intersection? Because a reasonable jury could go either way on that question, Ms. Weeks is not entitled to judgment as a matter of law on Count I.

### 3.    Gross Negligence (Count II)

But the fact that there is evidence from which a reasonable jury could find Ms. Weeks liable for negligence does not necessarily resolve her motion as to Count II, alleging gross negligence. And viewed in the light most favorable to Ms. Iocabeti, the record does not support such a claim.

"To state a claim for gross negligence, as with other negligence claims, a plaintiff must allege a duty of care, a breach of that duty, and damages as a proximate cause of the breach." *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 895 (D. Md. 2015)

---

[4] The applicability § 21-502 may affect the precise contours of both parties' duties at the time of the collision, and thus may need to be resolved before trial, at least for purposes of jury instructions. The parties shall plan to include their arguments on that issue in connection with their submission of a proposed pretrial order.

(cleaned up). But a plaintiff must also go further, to plead and prove "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635, 495 A.2d 838, 846 (1985)). In Maryland, gross negligence "implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id.* "Put another way, a defendant is liable for gross negligence 'only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Pasternak*, 95 F. Supp. 3d at 895 (quoting *Barbre*, 402 Md. at 187, 935 A.2d at 717). Whether negligent conduct constitutes gross negligence is usually a question for a jury. *See Cooper v. Rodriguez*, 443 Md. 680, 709, 118 A.3d 829, 846 (2015) (quoting *Taylor v. Harford Cty. Dep't of Social Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1034 (2004)). But that inquiry "can be determined as a matter of law when the facts clearly show that no reasonable jury could find that the defendant's actions amounted to gross negligence." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 187 (4th Cir. 2018).

The distinction between standard and gross negligence can affect a plaintiff's recovery in a few ways. The distinction was summarized in a 2000 article in the *Baltimore Law Review*:

> At this time, the Maryland Annotated Code contains twenty-four statutory immunities that protect individuals from claims of negligence, but do not apply to grossly negligent acts. Parties may use a contract to limit liability for their own acts of negligence but cannot do so when a party has been grossly negligent. A defendant's gross negligence may be sufficient to overcome a plaintiff's contributory negligence, thereby allowing the negligent plaintiff to recover. A landowner may only be held liable to a trespasser if his conduct can be defined as "willful and wanton," a standard which, as we will see, is indistinguishable from gross negligence. In these and various other contexts, the sufficiency of the plaintiff's complaint, the plaintiff's ability to plead his or her case before the jury, and the defendant's ultimate liability depend upon the

definition of gross negligence and the evidence required to plead and
to prove it.

Randolph Stuart Sergent, *Gross, Reckless, Wanton, And Indifferent: Gross Negligence In Maryland Civil Law*, 30 Balt. L. Rev. 1, 1-2 (2000).

Here, most of those distinctions do not apply. But the Court bears an affirmative obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted). Further, as discussed below, Ms. Weeks' contributory negligence defense survives summary judgment. Because under Maryland law proof of gross negligence *may* defeat a showing of contributory negligence, *id*.; *see also Liscombe*, 303 Md. at 636–37, 495 A.2d at 847 (1985) (assuming without deciding that contributory negligence is "not a defense in tort cases in which gross negligence has been shown"), whether Ms. Weeks is entitled to judgment as a matter of law on Ms. Iocabeti's gross negligence claim (Count II) remains a live issue.[5]

---

[5] Whether contributory negligence is a complete defense to gross negligence claims in Maryland is unclear. *See, e.g.*, *Ramos v. S. Md. Elec. Co-op., Inc*., 996 F.2d 52, 54–55 (4th Cir. 1993) ("Maryland never has held that contributory negligence does not bar gross negligence. To the contrary, many cases have suggested just the opposite in dicta."); *Est. of Saylor v. Regal Cinemas, Inc*., No. 13-cv-3089 WMN, 2016 WL 4721254, at *14 n.10 (D. Md. Sept. 9, 2016) ("[T]he question as to whether contributory negligence can be a bar to a gross negligence claim is an unsettled question under Maryland law."), *aff'd sub nom. Est. of Saylor v. Rochford*, 698 F. App'x 72 (4th Cir. 2017); *Rockwell v. Rawlins*, No. 13-cv-3049-RDB, 2014 WL 5426716, at *5 (D. Md. Oct. 23, 2014) ("[T]here is no definitive Maryland case law explaining the relationship between gross negligence and contributory negligence, and it appears that the United States Court of Appeals for the Fourth Circuit has determined that the Maryland would reject the Restatement's rule."); *Est. of Grillo by Grillo v. Thompson*, No. 21-cv-3132-GLR, 2022 WL 3027859, at *7 (D. Md. Aug. 1, 2022) ("[T]he Court need not consider whether [the defendant] was grossly negligent, because even if Plaintiffs were able to establish such gross negligence, it would not obviate [the decedent's] own contributory negligence under Maryland law."). But here, the Court need not, and does not, decide whether gross negligence in fact could defeat a contributory negligence defense because, regardless, Plaintiff has not come forward with evidence from which a reasonable jury could find gross negligence.

Although Ms. Iocabeti has adduced evidence that could support a jury verdict on negligence, that evidence, even with all inferences drawn in her favor, does not establish "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," or "utter[] indifferen[ce] to the rights of others." *Barbre*, 402 Md. at 187, 935 A.2d at 717; *see Boucher v. Riner*, 68 Md. App. 539, 547–48, 514 A.2d 485, 490 (1986) (affirming summary judgment in favor of defendant skydiving instructor on gross negligence claim where undisputed facts failed to suggest wanton or reckless disregard for plaintiff's life); *Stracke v. Est. of Butler*, 465 Md. 407, 426, 214 A.3d 561, 572 (2019) (affirming summary judgment in favor of defendant paramedic on gross negligence claim based on the absence of "a deliberate and conscious choice" to ignore emergency medical protocols); *Bailey v. City of Annapolis*, 252 Md. App. 83, 106, 258 A.3d 894, 905 (2021) (affirming dismissal of gross negligence claim based on arrest of wrong person whose name matched name on warrant); *see also Devi v. Prince George's Cnty.*, No. 16-cv-3790-DKC, 2018 WL 2364325, at *5 (D. Md. May 24, 2018) (granting summary judgment on gross negligence claim upon finding that the record did not support a "'gross departure' from ordinary conduct or reckless conduct"). In short, this is a negligence case, and Ms. Weeks is entitled to judgment as a matter of law on Ms. Iocabeti's claim for gross negligence. Judgment will be entered for Ms. Weeks on Count II.

### 4.     Contributory Negligence

This leaves the question whether a reasonable jury could find that Ms. Iocabeti was not contributorily negligent.

Under Maryland law, "a plaintiff who fails to observe ordinary care for his own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence." *Harrison v. Montgomery Cnty. Bd. of Educ.*, 295 Md. 442, 451,

456 A.2d 894, 898 (1983); *see Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690-91, 695,

69 A.3d 1149, 1155, 1158 (2013) (declining to abrogate common law contributory negligence

defense). Contributory negligence is "the doing of something that a person of ordinary prudence

would not do, or the failure to do something that a person of ordinary prudence would do, under

the circumstances." *Thomas v. Panco Mgmt. of Maryland, LLC*, 423 Md. 387, 417-18, 31 A.3d

583, 602 (2011) (citations and quotation marks omitted). A defendant bears the burden of proof

with regard to a contributory negligence defense. *Myers v. Bright*, 327 Md. 395, 403, 609 A.2d

1182, 1186 (1992).

The issue of contributory negligence is ordinarily a question of fact to be decided by a

jury. *Dell v. DeTar*, No. JFM-16-887, 2017 WL 3835679, at *6 (D. Md. 2017) (citing *Campbell v.

Baltimore Gas & Elec. Co*., 95 Md. App. 86, 93, 619 A.2d 213, 216 (1993)). While contributory

negligence may be decided as a matter of law, a court may do so only in "very narrow

circumstances." *Dell*, 2017 WL 3835679, at *6 (citing *Catler v. Arent Fox, LLP*, 212 Md. App.

685, 727-28, 71 A.3d 155, 180 (2013). "[T]o establish contributory negligence as a matter of law,

the act relied on must be distinct, prominent and decisive, and one about which ordinary minds

cannot differ." *Catler*, 212 Md. App. at 727, 71 A.3d at 180 (quoting *Crunkilton v. Hook*, 185

Md. 1, 6, 42 A.2d 517, 520 (1945)).

Here, Ms. Weeks contends that any reasonable jury would find that Ms. Iocabeti was

contributorily negligent, and thus that even if a jury could find that Ms. Weeks was negligent, she

is entitled to judgment as a matter of law. In particular, she argues that the undisputed evidence

establishes that: Ms. Iocabeti "was looking down at her phone when she entered the Crosswalk

heading westbound"; Ms. Iocabeti "proceeded through the northbound lanes, past the center

median, through the southbound lanes, and directly in front of [Ms. Weeks'] vehicle without ever

pausing or looking for approaching vehicles"; and Ms. Iocabeti "acted in this manner all while the traffic control lights around her were malfunctioning, and the pedestrian walk signal was not functioning at all." Def.'s Mem. at 12-13. Ms. Weeks further cites *Reid v. Pegg*, 256 Md. 289, 296, 260 A.2d 38, 42 (1969), *Pratt v. Coleman*, 14 Md. App. 76, 81-82, 286 A.2d 209, 212 (1972), and *Chasanow v. Smouse*, 168 Md. 629, 632, 178 A. 846, 847 (1935), for the proposition that a pedestrian can be found contributorily negligent as a matter of law when crossing between intersections without first looking for oncoming traffic. Def.'s Mem. at 12.

The problem for Ms. Weeks is that although a jury could agree with her—based on Mr. Beegle's testimony that Ms. Iocabeti was "looking down and just walking her normal stride" and did not "slow[] down at all" while crossing the street, for instance—there is evidence from which a jury could disagree with her, and conclude that Ms. Iocabeti exercised an appropriate amount of care for her own safety.

Notwithstanding her inability to recall the details of the collision, Ms. Iocabeti testified about her safety habits, including her practice of looking before crossing the street and only crossing when it is safe to do so. Iacobeti Dep. at 42:21-43:2. And although Ms. Yilderal said that she observed Ms. Iocabeti "talking with someone on her cell phone" as they were waiting on the sidewalk before crossing the street, Ms. Yilderal also shared her belief that Ms. Iocabeti was no longer on the phone when they were in the crosswalk. Yilderal Dec. ¶ 15. Indeed, Ms. Yilderal avers that as they crossed, Ms. Iocabeti "appeared to me to be attentive to where she was going and to walk in the crosswalk at a straight and steady pace in an effort to safely complete the crossing." *Id.* ¶ 16. Likewise, Mr. Gueriguian, Mr. Ginsberg, and Mr. Wertlieb, who were in the adjacent lane, contend that Ms. Iocabeti did not "dart[] out into traffic" or do anything they

20

would consider "sudden, erratic or unpredictable." Gueriguian Dec. ¶ 20; Ginsberg Dec. ¶ 20; Wertlieb Dec. ¶ 20.

As for Ms. Weeks' reliance on *Reid* and *Pratt*, in each of those cases, unlike here, the plaintiff's contributory negligence was proven by uncontradicted evidence. *See Reid*, 256 Md. at 297, 260 A.2d at 43 (undisputed evidence established that the plaintiff "either did not look prior to crossing the road, did not see when she did look, or failed to heed that which she saw"); *Pratt*, 14 Md. App. at 79, 81, 286 A.2d at 211, 212 (defendant's testimony, which "bound" plaintiff under the rules applicable at the time based on having called defendant as an adverse witness, established that plaintiff was walking on street in traffic lane, not at a cross walk, and thus there was "no question that the [plaintiff] left a place of safety for a position of danger"). Neither is the situation here. There are conflicting accounts as to whether Ms. Iocabeti was on her phone or otherwise distracted when she was crossing Philadelphia Avenue. *See Schwier v. Gray*, 277 Md. 631, 635, 357 A.2d 100, 102-03 (1976) ("Where there is a conflict of evidence as to material facts relied upon to establish contributory negligence . . . it is not for the court to determine its quality as a matter of law, but it is for the jury to pass upon it."). As for *Chasanow*, that opinion (from 1935) dealt with the applicability of a then-extant statute about pedestrians' "right of way at street crossings"; the holding in *Chasanow* court was that the statute did not apply, because the intersection at issue lacked a crosswalk or stop sign. 178 A. at 847. That analysis has no bearing on whether Ms. Iocabeti was contributorily negligent while walking in the crosswalk, under a flashing traffic light.

In short, there is competing evidence on what Ms. Iocabeti was doing in the moments before the collision, including whether she was looking forward or looking down at her phone; whether she was being attentive to approaching cars or not; and whether she slowed down and

looked before entering the lane that Ms. Weeks was driving in or not. Accordingly, Ms. Weeks is not entitled to judgment as a matter of law on her contributory negligence defense.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motions to strike (ECF No. 26). Defendant's motion for summary judgment (ECF No. 21) is denied as to Count I, and granted as to Count II. The parties shall confer and, within two weeks, file a status report setting forth the parties' estimate for the length of trial, and at least five alternative dates for trial.


Date:   May 15, 2024                              _____/s/_____

                                                  Adam B. Abelson
                                                  United States Magistrate Judge